Kathryn J. Steffey (10245)
ksteffey@SHutah.law
Devin L. Bybee (16009)
dbybee@SHutah.law
**SMITH HARTVIGSEN, PLLC**
257 East 200 South, Suite 500
Salt Lake City, Utah 84111
Telephone: (801) 413-1600
Facsimile: (801) 413-1620
*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TYR ENERGY LOGISTICS, LLC, a Texas limited liability company; TYR ENERGY COAL LOGISTICS, LLC, a Texas limited liability company; TYR ENERGY SAND LOGISTICS, LLC, a Texas limited liability company,<br><br>        Plaintiffs,<br><br>v.<br><br>GEO-HUNT CONSULTING, LLC, a Colorado limited liability company; GREGORY L. HUNT, an individual; and DOES I-X,<br><br>        Defendants. | **ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIM**<br><br>Case No. 2:18-cv-00967-BSJ<br><br>Judge Bruce S. Jenkins |

        Defendants, Geo-Hunt Consulting, LLC, and Gregory L. Hunt, by and through their undersigned counsel, answer Plaintiffs' Amended Complaint ("**Complaint**") and admit, deny, and otherwise respond as follows:

        1.        Defendants admit that TYR Energy Logistics LLC, is a Texas limited liability company but lack sufficient knowledge and information to form a belief as to the remaining allegations in Paragraph 1 of the Complaint and therefore deny the same.

2.      Defendants admit that TYR Energy Coal Logistics, LLC, is a Texas limited liability company but lack sufficient knowledge and information to form a belief as to the remaining allegations in Paragraph 2 of the Complaint and therefore deny the same.

3.      Defendants admit that TYR Energy Sand Logistics, LLC, is a Texas limited liability company but lack sufficient knowledge and information to form a belief as to the remaining allegations in Paragraph 3 of the Complaint and therefore deny the same.

4.      Defendants admit that, in the Complaint, Plaintiffs refer to TYR Energy, TYR Coal and TYR Sand collectively as the "***TYR Group.***"

5.      Defendants admit the allegations in Paragraph 5 of the Complaint.

6.      Defendants admit the allegations in Paragraph 6 of the Complaint.

7.      Defendants deny the allegations in Paragraph 7 of the Complaint.

8.      The allegations in Paragraph 8 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 8 of the Complaint.

9.      The allegations in Paragraph 9 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants admit the real property interests in dispute are located in the State of Utah but deny all remaining allegations in Paragraph 9 of the Complaint.

10.     The allegations in Paragraph 10 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants admit the allegations in Paragraph 10 of the Complaint.

11.     With respect to the allegations in Paragraph 11 of the Complaint, Defendants admit that TYR Energy Coal Logistics, LLC, was in need of a geologist to assist with certain coal-related business and that Defendants were retained by TYR Energy Coal Logistics, LLC, to assist it with acquiring a coal loadout and identifying and soliciting detailed coal quality, quantity, and timing information from coal producers who could deliver coal to TYR Energy Coal Logistics, LLC,

and/or its customers to a loadout facility.   Defendants affirmatively allege, however, that Defendants were not retained to help with projects in the physiographic Uintah Basin, as there are no coal mines or rail infrastructure in that area.   Instead, Defendants were retained as consultants by TYR Energy Coal Logistics, LLC to locate coal and a loadout facility within the geological structural Uintah Basin in Carbon and Emery Counties.   Defendants deny all remaining allegations in Paragraph 11 of the Complaint.

12.     Defendants admit the allegations in Paragraph 12 of the Complaint.

13.     The agreement speaks for itself and Defendants deny the allegations in Paragraph 13 of the Complaint to the extent they are inconsistent with or misconstrue the agreement.

14.     The agreement speaks for itself and Defendants deny the allegations in Paragraph 14 of the Complaint to the extent they are inconsistent with or misconstrue the agreement.

15.     The agreement speaks for itself and Defendants deny the allegations in Paragraph 15 of the Complaint to the extent they are inconsistent with or misconstrue the agreement.

16.     Defendants admit the allegations in Paragraph 16 of the Complaint.

17.     The agreement speaks for itself and Defendants deny the allegations in Paragraph 17 of the Complaint to the extent they are inconsistent with or misconstrue the agreement.

18.     The agreement speaks for itself and Defendants deny the allegations in Paragraph 18 of the Complaint to the extent they are inconsistent with or misconstrue the agreement.

19.     Defendants deny the allegations in Paragraph 19 of the Complaint.

20.     Defendants deny the allegations in Paragraph 20 of the Complaint.

21.     With respect to the allegations in Paragraph 21 of the Complaint, Defendants admit that they did not have experience in frac sand exploration and development prior to their first communications with the TYR Group, but deny the remaining allegations in Paragraph 21 of the Complaint.   Defendants affirmatively allege that the TYR Group similarly had no experience in frac sand exploration and development and that Defendants learned how to find and test frac sand on their own time and with their own resources.   Defendants further allege that the only

information the TYR Group had about frac sand in the Uintah Basin was not confidential, and therefore the TYR Group did not have, nor did it disclose to Defendants, any confidential or proprietary information regarding frac sand in the physiographic Uintah Basin where the La Playa Claims were filed.  Defendants further affirmatively allege that they found and tested frac sand deposits independent of any agreement or activities with Plaintiffs and without utilizing any proprietary information or resources from Plaintiffs.

22.     Defendants deny the allegations in Paragraph 22 of the Complaint.

23.     Defendants deny the allegations in Paragraph 23 of the Complaint.

24.     Defendants deny the allegations in Paragraph 24 of the Complaint.

25.     Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     With respect to the allegations in Paragraph 26 of the Complaint, Defendants admit they recorded frac sand claims on October 15, 2018, with the Uintah County Recorder's Office and referred to the claims as the La Playa Claims, but deny all remaining allegations in Paragraph 26 of the Complaint.

27.     Defendants admit the allegations in Paragraph 27 of the Complaint.

28.     Defendants deny the allegations in Paragraph 28 of the Complaint.

29.     Defendants deny the allegations in Paragraph 29 of the Complaint.

30.     Defendants deny the allegations in Paragraph 30 of the Complaint.

31.     Defendants admit that on December 3, 2018, a representative of TYR Energy Coal Logistics, LLC, sent a letter to Defendants demanding that Defendants transfer or assign the claims to TYR Energy Coal Logistics, LLC, but deny the remaining allegations in Paragraph 31 of the Complaint.

32.     Defendants admit that Hunt is the sole owner of all right, title, and interest in the La Playa Claims, but deny the remaining allegations in Paragraph 32 of the Complaint.  Defendants affirmatively allege that Plaintiffs have no factual or legal bases for their demand that Hunt assign the La Playa Claims to any or all of the Plaintiffs.

## FIRST CAUSE OF ACTION
(Quiet Title)

33.     Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

34.     Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations in Paragraph 35 of the Complaint.

36.     The allegations in Paragraph 36 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     Defendants deny the allegations in Paragraph 37 of the Complaint.

## SECOND CAUSE OF ACTION
(Constructive Trust)

38.     Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

39.     Defendants deny the allegations in Paragraph 39 of the Complaint.

40.     Defendants deny the allegations in Paragraph 40 of the Complaint.

41.     Defendants deny the allegations in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations in Paragraph 43 of the Complaint.

## THIRD CAUSE OF ACTION
(Breach of Contract)

44.     Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

45.     Defendants deny that they entered into any agreements with Plaintiffs relating to exploring for frac sand deposits, staking frac sand claims, or developing frac sands in the Uintah Basin.  Defendants affirmatively assert that the First Confidentiality Agreement and Second Confidentiality Agreement speak for themselves and Defendants deny all remaining allegations in

Paragraph 45 of the Complaint to the extent they are inconsistent with or misconstrue the agreements.

46.     The allegations in Paragraph 46 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 46 of the Complaint.

47.     The allegations in Paragraph 47 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 47 of the Complaint.

48.     Defendants deny the allegations in Paragraph 48 of the Complaint.

49.     Defendants deny the allegations in Paragraph 49 of the Complaint.

**FOURTH CAUSE OF ACTION**
(Breach of Implied Covenant of Good Faith and Fair Dealing)

50.     Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

51.     Defendants deny that they entered into any agreements with Plaintiffs relating to exploring for frac sand deposits, staking frac sand claims, or developing frac sands in the Uintah Basin.  Defendants affirmatively assert that the First Confidentiality Agreement and Second Confidentiality Agreement speak for themselves and Defendants deny all remaining allegations in Paragraph 51 of the Complaint to the extent they are inconsistent with or misconstrue the agreements.  Defendants deny all remaining allegations of Paragraph 51 of the Complaint.

52.     The allegations in Paragraph 52 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     The allegations in Paragraph 53 of the Complaint contain legal conclusions that require no response.  To the extent a response is required, Defendants deny the allegations in Paragraph 53 of the Complaint.

54.    Defendants deny the allegations in Paragraph 54 of the Complaint.

55.    Defendants deny the allegations in Paragraph 55 of the Complaint.

56.    Defendants deny the allegations in Paragraph 56 of the Complaint.

## FIFTH CAUSE OF ACTION
(Unjust Enrichment)

57.    Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

58.    Defendants deny the allegations in Paragraph 58 of the Complaint.

59.    Defendants deny the allegations in Paragraph 59 of the Complaint.

60.    Defendants deny the allegations in Paragraph 60 of the Complaint.

61.    Defendants deny the allegations in Paragraph 61 of the Complaint.

62.    Defendants deny the allegations in Paragraph 62 of the Complaint.

## SIXTH CAUSE OF ACTION
(Promissory Estoppel)

63.    Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

64.    Defendants deny the allegations in Paragraph 64 of the Complaint.

65.    Defendants deny the allegations in Paragraph 65 of the Complaint.

66.    Defendants deny the allegations in Paragraph 66 of the Complaint.

67.    Defendants deny the allegations in Paragraph 67 of the Complaint.

68.    Defendants deny the allegations in Paragraph 68 of the Complaint.

## SEVENTH CAUSE OF ACTION
(Breach of Fiduciary Duty/Duty of Loyalty)

69.    Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

70.    Defendants deny the allegations in Paragraph 70 of the Complaint.

71.    Defendants deny the allegations in Paragraph 71 of the Complaint.

72.     Defendants deny the allegations in Paragraph 72 of the Complaint.

73.     Defendants deny the allegations in Paragraph 73 of the Complaint.

74.     Defendants deny the allegations in Paragraph 74 of the Complaint.

75.     Defendants deny the allegations in Paragraph 75 of the Complaint.

## EIGHTH CAUSE OF ACTION
(Accounting)

76.     Defendants incorporate by reference the admissions, denials, and other responses set forth in the foregoing paragraphs as if fully stated herein.

77.     Defendants deny the allegations in Paragraph 77 of the Complaint.

78.     Defendants deny the allegations in Paragraph 78 of the Complaint.

79.     Defendants deny the allegations in Paragraph 79 of the Complaint.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to the relief requested in their prayer for relief.

## GENERAL DENIAL

Defendants deny each and every allegation not specifically admitted herein.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of waiver, estoppel, and laches.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred for failure to assert them in good faith.  To the extent Plaintiffs' claims are asserted in bad faith, Defendants are entitled to costs and attorneys' fees as allowed by Utah Code Ann. § 78B-5-825.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of unclean hands.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the terms of the Plaintiffs' agreements, acknowledgements, representations, warranties, and/or consents.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because any information that Plaintiffs had regarding frac sand was public information or was disclosed without confidentiality obligations by Plaintiffs to third parties.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Defendants did not have a fiduciary relationship or breach a fiduciary relationship with Plaintiffs regarding frac sand exploration and the filing of the La Playa Claims.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims must be dismissed because Plaintiffs have failed to join indispensable parties.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims fail because Plaintiffs did not confer a benefit upon Defendants with respect to the exploration, discovery, and filing of the La Playa Claims.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred due to failure or lack of consideration.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims fail because Defendants acted on their own power based on publicly available information to find and locate the La Playa Claims and Defendants funded their own exploration.

**TWELTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail because Defendants acted in good faith with respect to the conduct at issue.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail because the parties to any alleged contract did not reach agreement on all material terms.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail because there was no mutual assent, or "meeting of the minds," as to the terms of the alleged contract.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail because they are inconsistent with the terms of the parties' modified agreement.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred pursuant to the First Breach Rule.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' Complaint should be dismissed for lack of standing.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims fail due to the statute of frauds.

**NINETEENTH AFFIRMATIVE DEFENSE**

Defendants reserve the right to revise the foregoing affirmative defenses and raise additional affirmative defenses as additional information becomes known or the significance of known information becomes better understood throughout the course of discovery.

WHEREFORE, Defendants pray that Plaintiffs' Amended Complaint be dismissed with prejudice, that Plaintiffs take nothing thereby, and that Defendants be awarded costs and attorney fees in defending against this action.

## COUNTERCLAIM

Defendants Geo-Hunt Consulting, LLC, and Gregory L. Hunt (collectively "**Counterclaimants**"), by and through their undersigned counsel, hereby complain of TYR Energy Logistics, LLC, TYR Energy Coal Logistics, LLC, TYR Energy Sand Logistics, LLC, and Kip Eardley (collectively "**Counter Defendants**") and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Geo-Hunt Consulting, LLC, ("**Geo-Hunt**") is a Colorado limited liability company with its principal place of business in Colorado.

2.      Gregory L. Hunt ("**Hunt**") is a resident of the State of Colorado.

3.      TYR Energy Logistics, LLC ("**TYR Energy**"), is a Texas limited liability company.

4.      TYR Energy Coal Logistics, LLC ("**TYR Coal**"), is a Texas limited liability company.

5.      TYR Energy Sand Logistics, LLC ("**TYR Sand**"), is a Texas limited liability company.

6.      Kip Eardley is, upon information and belief, a resident of the State of Utah.

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

8.      This Court has personal jurisdiction over the Counter Defendants because the acts giving rise to this action occurred in the State of Utah and the real property interests are located in the State of Utah.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).\

## GENERAL ALLEGATIONS

10.     Counterclaimants' first contact with TYR Energy occurred in October 2017.

11.     TYR Energy's business focused exclusively on oil and coal, specifically the logistical transportation of oil and coal.

12.     TYR Energy was interested in meeting with Counterclaimants because Hunt owned an interest in the Kinney Coal Mine, which TYR Energy had hoped to acquire.

13.     After Hunt explained that it would require a significant investment in capital to open the Kinney Coal Mine, TYR Energy's interest faded.

14.     The TYR Energy representatives also expressed an interest in a coal property located by Salina Creek in Sevier County, Utah.

15.     During the October 2017 meeting between TYR Energy and Counterclaimants, there was no mention of any interest in frac sand exploration.

16.     To protect Counterclaimants' proprietary information regarding the Kinney Coal Mine that would be disclosed to TYR Energy, TYR Energy and Hunt entered into a Non-Disclosure and Non-Circumvention Agreement on October 15, 2017 ("**2017 NDA**").  (*See* 2017 NDA, attached as **Exhibit A**.)

17.     The 2017 NDA states that "Confidential Information shall not include information that is otherwise available to the public (other than as a result of a breach or violation of this agreement, or is made available to the public by the Disclosing Party or a third party (not in violation of any confidentiality obligation, including but not limited to this Agreement); that is furnished by the Disclosing Party to a third party without restriction; or that is already or may be lawfully in possession of the Receiving Party and was not known by the Receiving Party to be subject to an existing agreement of confidentiality by which Receiving Party is bound."  (*Id.*)

18.     Shortly thereafter, Hunt disclosed to TYR Energy a Kinney Coal Mine power point presentation, which provided Confidential Information about the Kinney Coal Mine.

19.     Geo-Hunt also disclosed information about the coal mine near Salina Creek.

20.     TYR Energy did not disclose any Confidential Information under the 2017 NDA, nor did it follow up regarding the information that Hunt provided about the Kinney Coal Mine. No further contact between TYR Energy and Hunt was initiated regarding the Kinney Coal Mine at that time.

21.     In or about April 2018, Kip Eardley contacted Hunt to arrange a meeting.

22.     During this call, Mr. Eardley represented himself as the President of TYR Coal and made no mention of TYR Energy.  Mr. Eardley explained that he needed a "coal guy" and that Jae Potter, then Chairman of the Carbon County Commission, had recommended Hunt.

23.     Mr. Eardley and Hunt scheduled a meeting to take place in Green River, Utah on or about April 26, 2018.

24.     Mr. Eardley made no mention of frac sand exploration during this phone call.

25.     On or about April 26, 2018, Mr. Eardley and Hunt met in Green River, Utah.

26.     Mr. Eardley provided an outline of projects TYR Coal had an interest in, including purchasing the Kinney Coal Mine and purchasing a rail transloading facility capable of transloading oil and coal in Carbon County, Utah.

27.     During this meeting, Mr. Eardley did not mention any interest in exploring frac sand in the Uintah Basin.

28.     Based on the discussions about acquiring the Kinney Coal Mine and obtaining a rail transloading facility and the need to protect information about the same, Mr. Eardley insisted that Geo-Hunt enter into the Mutual Confidentiality, Non-Disclosure and Non-Circumvention Agreement ("**2018 NDA**").  Hunt also insisted that TYR Coal enter into a Mutual Confidentiality Agreement with Carbon Resources, LLC, which owned the Kinney Coal Mine.  The Mutual Confidentiality Agreement was executed on May 16, 2018.

29.     Mr. Eardley was especially concerned about maintaining the confidentiality of TYR Coal's plan to transload oil from trucks transporting oil from Roosevelt, Utah, down Willow Creek Canyon, to Carbon County to be transloaded onto rail in Carbon County.

30.     Accordingly, Hunt, on behalf of Geo-Hunt, and Mr. Eardley, as the purported president of TYR Coal, signed the 2018 NDA on April 24, 2018 (*See* 2018 NDA, attached as **Exhibit B**.)

31.     The 2018 NDA Recitals state the following regarding the scope of the 2018 NDA:

> The Parties hereto have an interest to collectively pursue certain business (hereinafter the "Business") related to developing logistics solutions for the export of minerals from North America to international markets (hereinafter the "Permitted Purpose") which requires the disclosure of certain Confidential Information.

(*Id.*)

32.     Within the stated scope, the 2018 NDA defined "Confidential Information" to mean "any information provided by a Party to the other Party, including any negotiations or discussions concerning any potential or prospective transaction."  (*Id.*)

33.     The 2018 NDA does not mention frac sand and there were no discussions about frac sand between the parties prior to or at the time of signing the 2018 NDA.  (*See id.*)

34.     In addition, the 2018 NDA states that "[t]hese restrictions on the use or disclosure of Confidential Information shall not apply to any Confidential information which:

- is generally available to the public or has become generally available to the public without breach of this Agreement by the Receiving Party; or

- the Providing Party agrees in writing is free of such restrictions; or

- becomes lawfully available to the Receiving Party without any restriction of confidentiality from a third party free from confidentiality obligations with respect thereto; or

- was independently developed by the Receiving Party without use of the Confidential Information prior to the date of this Agreement."

(*Id.*)

35.     Later, on May 1, 2018, Geo-Hunt and TYR Coal entered into a Consulting Agreement.  (*See* Consulting Agreement, attached as **Exhibit C**.)

36.     The Consulting Agreement pertained exclusively to Geo-Hunt's "services in connection with:

> 1 – Acquisition of the Wildcat Load Facility, Carbonville, UT
>
> 2 – Other Projects as may be agreed upon."

(*Id.*)

37.     The only services agreed upon in the Consulting Agreement were described as:

> 1 – Facilitate purchase of Wildcat Loadout Facility by:
> > a – Make every effort to bring the negotiations to a successful conclusion at the earliest possible time by convincing seller that publicizing an RFP for sale of the property is not necessary.
> > b – Utilizing detail knowledge of the loadout and ability to quickly update knowledge of local business dynamics to negotiate a detail purchase agreement prior to face to face negotiations/or closing between TYR and seller.
> 2 – Other services as mutually agreed upon.

(*Id.*)

38.     The Consulting Agreement does not mention frac sand and there were no discussions of frac sand between the parties prior to or at the time of signing the Consulting Agreement.  (*See id.*)

39.     The Consulting Agreement further states that "[c]lient agrees that all services not expressly included are excluded from Geo-Hunt's Scope of Service."  (*Id.*)

40.     Defendants and TYR Coal did not agree to include any other projects, including any projects to explore frac sand claims, in the Consulting Agreement.

41.     In entering into the Consulting Agreement, TYR Coal agreed to "compensate Geo-Hunt for such services as follows: Geo-Hunt will track and bill Client for services at the rate of $120.00/hour actually worked, plus expenses."  (*Id.*)

42.     Shortly after entering into the Consulting Agreement, on May 7, 2018, TYR Coal wired Geo-Hunt a $5,000 advance for work to be performed under the Consulting Agreement.

43.     Three days later, on May 4, 2018, Geo-Hunt and TYR Coal entered into the Master Brokerage Fee Agreement ("**Fee Agreement**").  (*See* Fee Agreement, attached as **Exhibit D**.)

44.     The Fee Agreement describes the "Nature of Services" as Geo Hunt "provid[ing] brokerage services in the coal supply market, to locate acceptable coal supply at currently producing mine and facilitate sale of coal from the producer to TYR or its designee." (*Id.*)

45.     As compensation, TYR Coal agreed to pay Geo-Hunt a "brokerage fee" of "($0.10) per metric ton for each ton of coal sold under this agreement, measured and earned as loaded in truck or rail at mine mouth." (*Id.*)

46.     Like the 2017 NDA, 2018 NDA, and Consulting Agreement, the Fee Agreement makes no mention of frac sand. (*See id.*)

47.     Shortly after the agreements were executed, Geo-Hunt began working towards obtaining the Wildcat Loadout facility, a coal facility which was owned by Intermountain Power Agency ("**IPA**").

48.     Specifically, Geo-Hunt reached out to IPA's consultant, Lance Lee, who was preparing a Request for Proposal for bids to purchase the Wildcat Loadout facility.

49.     Mr. Lee provided Geo-Hunt with background information on the Wildcat Loadout facility to assist Hunt in preparing a bid on behalf of TYR Coal.

50.     However, IPA sold the Wildcat Loadout to another party prior to the published deadlines for bids to be submitted.

51.     Hunt was able to take advantage of his contacts in the area and began due diligence on the Railco Loadout, an alternative coal loadout facility that TYR Coal had expressed interest in acquiring.

52.     Geo-Hunt invested considerable time and effort into investigating the Railco Loadout facility.

53.     However, when Mr. Eardley took over negotiations with Railco Loadout from Geo-Hunt, the negotiations broke down and TYR Coal informed Geo-Hunt that it was discontinuing its effort to secure the Railco Loadout.

54.     Using his local contacts, Hunt was able to identify an additional coal facility in the area, known as the Castle Gate facility.

55.     With the authorization of TYR Coal, Geo-Hunt made an offer to purchase the Castle Gate facility and engaged in negotiations regarding the purchase of the facility.

56.     As a result of Geo-Hunt's discovery of the opportunity and successful negotiations on behalf of TYR Coal, TYR Coal purchased the Castle Gate facility.

57.     Geo-Hunt provided numerous hours (in excess of 216.1 billable hours) of consulting services to TYR Coal in connection with its purchase of the Castle Gate facility, including reviewing and modeling a coal waste pile located on the Castle Gate facility property and other coal waste piles in Utah that would benefit the coal operations.

58.     Pursuant to the Consulting Agreements, Geo-Hunt's services totaled $25,440.64 for all of Counterclaimants' work to secure a coal loadout facility and other coal related services.

59.     However, to date, the only payment received from TYR Coal is the $5,000.00 advance payment, leaving an unpaid balance of over $20,000.00.

60.     Pursuant to the Fee Agreement, Counterclaimants spent over 150 hours seeking to obtain coal to fill purported contracts that TYR Coal represented to Counterclaimants it had secured.

61.     While Geo-Hunt was seeking sources of coal to fill TYR Coal's purported coal contracts, Hunt asked Mr. Eardley on more than five separate occasions whether TYR Coal had valid contracts, explaining that coal suppliers would require such contracts before they agreed to provide coal.

62.     Hunt also informed Mr. Eardley that misrepresenting the existence of coal contracts would substantially damage the reputation of Counterclaimants and TYR Coal in the industry.

63.     In response, Mr. Eardley informed Hunt several times that TYR Coal did in fact possess binding, current contracts and Hunt simply needed to find the coal to fill the contracts.

17

64.     Pursuant to Mr. Eardley's representations, Mr. Hunt contacted coal producers in Carbon and Emery Counties and received quotes from those producers to provide coal for TYR Coal's purported coal contracts.

65.     To secure agreements with the coal suppliers, Counterclaimants were required to represent and warrant that TYR Coal had coal contracts in place.  Those representations were necessary before coal producers would provide detailed, proprietary information regarding their capacity to produce, the specifications of their coal, and the timing of their ability to produce and deliver coal to TYR Coal.

66.     Counterclaimants obtained quotes from UEA Lila Canyon Mine, Bowie Skyline Mine, and RHINO Castle Valley Mine.  The process proceeded to the contract phase with RHINO but all negotiations ended when Mr. Eardley failed to produce evidence of the existence of a contract or a letter of credit that would have credibly established TYR Coal's ability to perform.

67.     Counterclaimants eventually discovered that Mr. Earley's representations were false and that TYR Coal did not have any effective coal contracts, but instead merely had qualified commitments from operators in Mexico and Asia, many that do not have strong reputations in the industry.  Such qualified commitments to purchase coal were not credible in the eyes of the Utah coal producers with which Counterclaimants had been negotiating on behalf of TYR Coal.

68.     When the coal operators discovered that TYR Coal did not have coal contracts, the coal operators refused to engage in any further negotiations with Counterclaimants.

69.     As a result, Counterclaimants' credibility and business reputation was substantially harmed, damaging business relationships that Counterclaimants had worked years to develop with the coal operators, which has harmed Counterclaimants' business and goodwill.

70.     In large part due to Counterclaimants' work for TYR Coal, TYR Coal's business was expanding and attracting the attention of stakeholders in the area.

71.     In or about June 2018, representatives of the Utah State School and Institutional Trust Lands Administration ("**SITLA**") approached representatives of TYR Coal inquiring about TYR Coal's interest in finding, developing, and mining frac sand.

72.     SITLA had been seeking to find frac sand opportunities on SITLA lands for several years, and commissioned the Utah Geological Survey ("**UGS**") to conduct a state-wide survey to locate frac sand deposits on SITLA lands.

73.     Based on its survey, UGS published a report in July 2013 ("**Report**") describing the results of its investigation.

74.     The Report identified several potential sites that could produce frac sand, but revealed that UGS only found two viable frac sand sites, both of which were located outside of the Uintah Basin.

75.     Nevertheless, hoping to benefit from valuable frac sand ventures, representatives of SITLA convinced representatives of TYR Coal to choose three of the sites in the Uintah Basin that were listed in the Report to determine whether any frac sand existed on the SITLA sites.

76.     Rather than pursue those activities as part of TYR Coal's operations, on or about July 6, 2018, Mr. Walter formed TYR Energy Sand Logistics, LLC ("**TYR Sand**"), to act on the information received from SITLA.

77.     TYR Sand is a separate and distinct entity from TYR Energy and TYR Coal.

78.     Prior to forming TYR Sand, the representatives of TYR Coal had no involvement, background, or expertise in finding, developing, and mining frac sand.

79.     Indeed, except for an email from AXIA, which indicated the size fraction and volume of sand they preferred to use on their frac sand completions that mirrored information available to the public, including the UGS Report, the TYR Coal representatives had no proprietary information about frac sand.

80.     In addition, upon information and belief, the email from AXIA was sent to Lauren Morvitz, a University of Utah student working on her thesis about frac sand, and Ms. Morvitz did

not enter into a nondisclosure agreement with any of the TYR entities, making the AXIA email non-confidential information.

81.     Neither Geo-Hunt nor Hunt are members of, or have any interest in, TYR Sand. Additionally, neither Geo-Hunt nor Hunt entered into any agreements of any kind with TYR Sand.

82.     Furthermore, Defendants never received any remuneration, or even a promise of future remuneration, from TYR Energy, TYR Coal, or TYR Sand for any kind of frac sand exploration services.

83.     Like the representatives of TYR Energy, TYR Coal, and TYR Sand, Hunt also did not have a background in locating, developing, and mining frac sand.

84.     Accordingly, after learning of the public UGS Frac Sand Report from Mr. Eardley, Hunt spent numerous hours researching frac sand deposits and how to locate frac sand deposits.

85.     Later, Hunt and Mr. Eardley met Ms. Morvitz to explore the sites and obtain frac sand samples.

86.     All of the samples came back negative; they did not find any frac sand.

87.     A report about the unsuccessful search for frac sand was given to Mr. Walter, who, upon information and belief, is the manager of TYR Sand.  Mr. Eardley told Hunt that Mr. Walter repeatedly stated that he lacked interest in mining frac sand and that he had also decided to abandon the frac sand efforts.

88.     Thereafter, Counterclaimants, based on their own research and using their own tools, decided to search for frac sand deposits outside of SITLA lands and later found frac sand on BLM land, resulting in the filed La Playa Claims.

89.     During their search for frac sand and filing the La Playa Claims, Counterclaimants stayed in touch with Kip Eardley and Don Foote by telephone and email but had no contact with Mr. Walter or TYR Sand.

90.     Later, due to not having an expertise in transportation and logistics, Counterclaimants proposed a Grant of Carried Interest agreement with TYR Sand, which would

provide Counterclaimants an equity interest in TYR Sand in exchange for conveying to TYR Sand the La Playa Claims.  TYR Sand rejected the proposed agreement.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment—Defendants TYR Energy, TYR Coal, and TYR Sand)

91.     Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

92.     Under Utah Code Ann. § 78B-6-401(1), this Court has "the power to issue declaratory judgments determining rights, status, and other legal relations within its respective jurisdiction."

93.     TYR Energy, TYR Sand, and TYR Coal claim an ownership interest in the La Playa Claims.

94.     However, at no time did Counterclaimants enter into any agreements with TYR Energy, TYR Coal, or TYR Sand with respect to the exploration and development of frac sand claims.  Moreover, at no time were Counterclaimants compensated, or promised compensation, for any work done to find frac sand on SITLA lands or other lands.

95.     While Counterclaimants provided some assistance to TYR Sand in exploring potential frac sand claims on SITLA lands, such assistance was volunteered, without contractual obligation or payment, and was limited to SITLA lands based on the publicly available UGS Frac Sand Report.

96.     TYR Sand also recruited an additional volunteer to assist in the exploration of SITLA lands by arranging to have Lauren Morvitz, a University of Utah student working on her thesis about frac sand, assist in the exploration.  As with Counterclaimants, Ms. Morvitz's assistance was neither compensated nor subject to a nondisclosure or confidentiality agreement.

97.     None of the TYR entities or their representatives disclosed to Counterclaimants any proprietary or confidential information regarding frac sand.

21

98.     After TYR Sand's initial investigation for frac sand failed, representatives of TYR Sand told Counterclaimants that they had no further interest in pursuing frac sand.

99.     Thereafter, based on their own research, publicly available information, and using their own equipment and funding their work, Counterclaimants set out to find frac sand on BLM land and discovered and filed the La Playa Claims.

100.    Because there were no agreements between Counterclaimants and Counter Defendants with respect to frac sand and because Counterclaimants did not rely on any confidential information from Counter Defendants or any funds or compensation from Counter Defendants, Counterclaimants have full legal interest in the La Playa Claims discovered solely by Counterclaimants.

101.    Therefore, Counterclaimants are entitled to a judgment declaring that they own the La Playa Claims and that Counter Defendants TYR Energy, TYR Sand, and TYR Coal have no interest in the La Playa Claims.

WHEREFORE, Counterclaimants demand judgment as described below.

### SECOND CAUSE OF ACTION
### (Fraud—Defendants TYR Coal and Eardley)

102.    Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

103.    Pursuant to the Fee Agreement, Counterclaimants agreed to obtain coal suppliers to supply purported contracts TYR Coal misrepresented as having in place.

104.    Before placing their credibility and reputation on the line with coal companies they had been working with for years to secure coal supplies for TYR Coal, Counterclaimants asked Mr. Eardley on at least five separate occasions whether TYR Coal did, in fact, have coal contracts in place.

105.    Mr. Eardley asserted unequivocally that TYR Coal did have coal contracts, which was not true.

106.    Mr. Eardley's misrepresentations to Counterclaimants induced Counterclaimants to invest substantial time and resources in seeking sources of coal that met the specifications requested by TYR Coal.

107.    Additionally, Mr. Eardley's misrepresentations to Counterclaimants induced Counterclaims to place their credibility and reputation at stake in reaching out to the coal suppliers and representing to the coal suppliers that TYR Coal had contracts in place.

108.    Pursuant to Mr. Eardley's repeated false representations that TYR Coal had coal contracts in place, Counterclaimants acted reasonably in relying upon that information.

109.    When the coal suppliers discovered that TYR Coal did not have coal contracts in place, they withdrew their commitments to supply coal and their relationship with Counterclaimants has been damaged.

110.    As a result, Counterclaimants have sustained substantial damage to their business reputation and goodwill.

111.    Additionally, due to Mr. Eardley's misrepresentations, Counterclaimants were unable to be compensated under the Fee Agreement to offset the time and expenses expended to secure the coal producers.

112.    Mr. Eardley's misrepresentations on behalf of TYR Coal have been willful, malicious, and/or recklessly indifferent.

113.    As a direct and proximate result of Mr. Eardley's and TYR Coal's actions, Counterclaimants have suffered damages in an amount to be proven at trial.

WHEREFORE, Counterclaimants demand judgment as described below.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation—Defendants TYR Coal and Eardley)

114.    In the alternative to its Second Cause of Action, Counterclaimants incorporates and adopts by reference the allegations contained in paragraphs 1-99 as if fully set forth herein.

115.    Pursuant to the Fee Agreement, Counterclaimants agreed to obtain coal suppliers to supply purported contracts that TYR Coal represented it had in place.

116.    Because representing to suppliers that a company had a coal contract, if not true, would substantially harm the reputation and goodwill of Counterclaimants, Counterclaimants expressly asked Mr. Eardley on at least five separate occasions whether TYR Coal did, in fact, have coal contracts rather than mere prospects.  Counterclaimants also explained the damages that could result if they misrepresented the existence of such contracts to coal suppliers.

117.    Mr. Eardley asserted unequivocally that TYR Coal did have coal contracts in place, which was not true.

118.    Mr. Eardley was in a superior position to know material facts relating to the coal contracts.

119.    Mr. Eardley carelessly or negligently made false representations to Counterclaimants, including, but not limited to, that TYR Coal did have specific contracts in place.

120.    Mr. Eardley's misrepresentations on behalf of TYR Coal have been negligent or careless, or both.

121.    Mr. Eardley's misrepresentations to Counterclaimants induced Counterclaimants to expended considerable time and resources and to place their reputation and goodwill at stake in reaching out to the coal suppliers and representing to the coal suppliers that TYR Coal had contracts in place.

122.    Pursuant to Mr. Eardley's repeated misrepresentations that TYR Coal had coal contracts in place, Counterclaimants acted reasonably in relying upon that information.

123.    When the coal suppliers discovered that TYR Coal did not have coal contracts, they withdrew their commitments to supply coal and they ceased working with Counterclaimants.

124.    As a direct and proximate result of Mr. Eardley's and TYR Coal's actions, Counterclaimants have sustained substantial damage to their business reputation and goodwill, together with the loss of Counterclaimants' time and resources expended to secure coal producers.

24

125.    Accordingly, Counterclaimants are entitled to damages in an amount to be proven at trial.

WHEREFORE, Counterclaimants demand judgment as described below.

### FOURTH CAUSE OF ACTION
### (Constructive Fraud—Defendants TYR Coal and Eardley)

126.    Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

127.    As a result of the 2018 NDA, Consulting Agreement, and Fee Agreement Counterclaimants entered into with TYR Coal, Counterclaimants and TYR Coal had a confidential relationship with respect to Counterclaimants' responsibilities to locate coal supplies.

128.    Because representing to suppliers that a company had a coal contract, if not true, would substantially harm the reputation and goodwill of Counterclaimants, Counterclaimants expressly asked Mr. Eardley on at least five separate occasions whether TYR Coal did, in fact, have coal contracts in place rather than mere prospects.  Counterclaimants also explained the damages that could result if they misrepresented the existence of such contracts to coal suppliers.

129.    On behalf of TYR Coal, Mr. Eardley failed to disclose material facts to Counterclaimants that TYR Coal did not have coal contracts in place.

130.    When the coal suppliers discovered that TYR Coal did not have coal contracts in place, they withdrew their commitments to supply coal and ceased working with Counterclaimants

131.     As a direct and proximate result of Mr. Eardley's failure to disclose the material facts that TYR Coal did not have coal contracts, Counterclaimants have sustained substantial damage to their business reputation and goodwill, together with the loss of Counterclaimants' time and resources expended to secure coal producers.

132.    Accordingly, Counterclaimants are entitled to damages in an amount to be proven at trial.

WHEREFORE, Counterclaimants demand judgment as described below.

## FIFTH CAUSE OF ACTION
### (Breach of Contract—Defendant TYR Coal)

133.    Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

134.    On May 1, 2018, Counterclaimants and TYR Coal entered into the Consulting Agreement, which required TYR Coal to compensate Counterclaimants in the amount of $120.00 per hour for Counterclaimants' services.

135.    Counterclaimants worked over 216.1 hours for TYR Coal pursuant to the Consulting Agreement to secure a loadout facility, attempting to obtain loadouts for TYR Coal's coal logistic operation, and reviewing and modeling coal waste piles in Utah that would benefit the coal operations.

136.    TYR Coal has only paid Counterclaimants $5,000.00under the Consulting Agreement and has failed to pay the remaining amount of $20,440.64 that is owed.

137.    TYR Coal has therefore breached the Consulting Agreement to compensate Counterclaimants for their work on an hourly basis.

138.    As a result of TYR Coal's breach, Counterclaimants are entitled to a judgment in the amount to be determined at trial, but in no event less than $20,000.00.

WHEREFORE, Counterclaimants demand judgment as described below.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing—Defendant TYR Coal)

139.    Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

140.    The Fee Agreement between Counterclaimants and TYR Coal included an implied covenant of good faith and fair dealing, in which TYR Coal covenanted that it would not intentionally or purposefully do anything that would destroy or injure Counterclaimants' right to receive the fruits of the agreement.

141.    TYR Coal breached the covenant of good faith and fair dealing by misrepresenting the availability of coal contracts.

142.    As a result of TYR Coal's breach of the implied covenant of good faith and fair dealing, Counterclaimants expended considerable time and resources and have been damaged in an amount to be determined at trial but in no event less than $25,000.00.

WHEREFORE, Counterclaimants demand judgment as described below.

**SEVENTH CAUSE OF ACTION**
**(Unjust Enrichment—Defendant TYR Coal)**

143.    Counterclaimants repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

144.    In the alternative to Counterclaimants' breach of contract and breach of the implied covenant of good faith and fair dealing claims, Counterclaimants are entitled to compensation under the theory of unjust enrichment for their work in securing a loadout facility, attempting to obtain loadouts for TYR Coal's coal logistic operation, and reviewing and modeling coal waste piles in Utah that would benefit the coal operations, together with their work in attempting to secure coal producers.

145.    Counterclaimants' coal-related services conferred a benefit on TYR Coal.

146.    It would be unjust for TYR Coal to retain the benefit of Counterclaimants' work.

147.    Accordingly, Counterclaimants are entitled to a judgment in the amount to be determined at trial, but in no event less than $45,000.00.

WHEREFORE, Counterclaimants demand judgment as described below.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimants request that the Court enter judgment in their favor and against Counter Defendants and award Counterclaimants the following relief:

1.    Under the First Cause of Action, declaratory judgment that Counterclaimants are the rightful owners of the La Playa Claims.

2.      Under the Second Cause of Action, an award against TYR Coal and Mr. Eardley for damages, including punitive damages, in an amount to be proven at trial.

3.      Under the Third Cause of Action, an award against TYR Coal and Mr. Eardley for damages, including punitive damages, in an amount to be proven at trial.

4.      Under the Fourth Cause of Action, an award against TYR Coal and Mr. Eardley for damages, including punitive damages, in an amount to be proven at trial.

5.      Under the Fifth Cause of Action, an award against TYR Coal for damages in an amount to be proven at trial, but not less than $20,000.00.

6.      Under the Sixth Cause of Action, an award against TYR Coal for damages in an amount to be proven at trial, but not less than $25,000.00.

7.      Under the Seventh Cause of Action, an award against TYR Coal for damages in an amount to be proven at trial, but not less than $45,000.00.

8.      Attorney fees and costs as authorized by law.

9.      Such other relief as this Court deems just and equitable.

DATED the 30th day of May, 2019.

SMITH HARTVIGSEN, PLLC

/s/ Kathryn J. Steffey
Kathryn J. Steffey
Devin L. Bybee
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of May, 2019, I caused a true and correct copy of the

foregoing **ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIM** to be served

on the following by the Court's electronic filing system:

> David R. Hall
> **PARSONS BEHLE & LATIMER**
> 201 South Main Street, Suite 1800
> Salt Lake City, Utah 84111
> dhall@parsonsbehle.com

> /s/ *Jacob Clark*
> Legal Assistant
> **SMITH HARTVIGSEN, PLLC**

# EXHIBIT A

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

This Non-disclosure and Non-circumvention Agreement (this "Agreement") is entered into this _15_ day of October, 2017 (the "Effective Date"), by and among TYR Energy Logistics, LLC, a Texas limited liability company ("TYR") and Greg Hunt, an individual residing in Colorado ("Hunt"). TYR and Hunt are also herein interchangeably referred to as the "Receiving Party" or the "Disclosing Party" as applicable or singularly as a "Party" or collectively together the "Parties").

WHEREAS, each of the Parties hereto desires to enter into this Agreement as a condition to any one or more such Party (the "Disclosing Party") providing information with respect to a Receiving Party potentially investing in, lending to or engaging in another transaction with the Disclosing Party (the "Possible Transaction"); and

WHEREAS, the Parties desire to maintain the confidentiality of the Confidential Information;

NOW, THEREFORE, in consideration of the undertakings herein, and as a condition of receiving such Confidential Information, each Party agrees, for the period two years from the date hereof, as follows:

1. **Confidential Information**. As used in this Agreement, "Confidential Information" shall mean information furnished or disclosed by the Disclosing Party to the Receiving Party, including, without limitation, (a) any materials, trade secrets, know-how, formulas, processes, contacts, ideas, strategies, inventions, data, network configurations, computer programs, software and documentation, prototypes, methods, system architecture, specifications, models, samples, designs, flow charts, drawings and all other technical information; and (b) proprietary information, including, without limitation, business and marketing plans and models, contracts, pricing information, product information, proposals, financial models, and other financial and operational information, customer, borrower and prospect lists and logs and all other non-public information, material or data relating to the current  business and business plans of the Disclosing Party and/or its existing and prospective loans, investments and other business opportunities of the Disclosing Party (each a "Disclosing Party Opportunity"). To the extent not otherwise covered by (a) or (b) above, Confidential Information shall also include any information contained in the business plans of the Disclosing Party and/or other materials or information that are furnished by the Disclosing Party in connection with the Possible Transaction. Confidential Information shall not include information that is otherwise available to the public (other than as a result of a breach or violation of this Agreement) or is made available to the public by the Disclosing Party or a third party (not in violation of any confidentiality obligation, including but not limited to this Agreement); that is furnished by the Disclosing Party to a third party without restriction; or that is already or may be lawfully in possession of the Receiving Party and was not known by the Receiving Party to be subject to an existing agreement of confidentiality by which Receiving Party is bound.

2. **Non-disclosure Obligation**. The Receiving Party:  (a) shall use such Confidential Information only for the purposes of evaluating the Possible Transaction and not for any other purpose; (b) shall hold all Confidential Information in confidence and shall restrict disclosure of such Confidential Information to any person unless the Receiving Party obtains the express prior written permission from the Disclosing Party, as applicable, provided that the Confidential Information (or portions thereof) may be disclosed to those of the Receiving Party's officers, directors, employees, advisors, lenders and representatives (collectively, "Representatives") who need to know such information for the purpose of evaluating the Possible Transaction (it being understood that prior to such disclosure, the Receiving Party's Representatives will be informed of the confidential nature of

the Confidential Information and shall agree to be bound by this Agreement); and (c) shall use at least the same degree of care as the Receiving Party uses with regard to its own proprietary and/or confidential information to prevent the disclosure, use, or publication of such Confidential Information.   The Receiving Party shall be responsible for any breach of this Agreement by its Representatives.   Upon request by the Disclosing Party and subject to the Receiving Party's regulatory requirements, all Confidential Information in written or electronic form, including any documents, memoranda, notes, reports, presentations or analyses derived, in whole or in part, therefrom or prepared by the Receiving Party or its Representatives based upon any Confidential Information, and all copies of any of the foregoing, will either be promptly returned to the Disclosing Party or destroyed, with compliance therewith confirmed in writing by the Receiving Party; provided that if the Parties hereto enter into a definitive agreement with respect to the Possible Transaction, the Receiving Party will be entitled to maintain such documents as may be reasonably necessary for its due diligence.   Notwithstanding the return or destruction of the Confidential Information, the Receiving Party shall continue to be bound by its obligations hereunder.

3.       **Non-Circumvention**.   The Receiving Party agrees that it shall not directly or indirectly interfere with, circumvent, or attempt to circumvent, avoid, by-pass, or obviate the Disclosing Party's contacts, affiliates or any existing or potential lender, investor or broker of the Disclosing Party.  The foregoing includes, but is not limited to all related assets, plans or contracts of any Disclosing Party.

4.       **Non-Solicitation**.   The Receiving Party agrees that, for a period of two years from and after the date hereof, without the prior written consent of the Disclosing Party, in cases relating to the Disclosing Party, or both the Disclosing Party and the Disclosing Party Opportunity, in cases relating to a Disclosing Party Opportunity, it will not, and will cause its affiliates not to, directly or indirectly, (a) solicit any individual who is an executive officer, other member of senior management or employee of the Disclosing Party, any affiliate thereof, or a Disclosing Party Opportunity from and after the Effective Date to leave his or her employment therewith or interfere with the employment relationship between the Disclosing Party, any affiliate thereof, or the Disclosing Party Opportunity, on the one hand, and any individual who is an executive officer, other member of senior management or employee of the Disclosing Party, any affiliate thereof, or a Disclosing Party Opportunity, on the other hand, or (b) hire any individual who is an executive officer, other member of senior management or employee of the Disclosing Party, any affiliate thereof, or a Disclosing Party Opportunity during the twelve month period preceding the date hereof; provided that the foregoing restrictions shall not prohibit the Receiving Party from: (A) soliciting or hiring any individuals through the placement of general advertisements of employment opportunities which are not specifically directed at employees of the Disclosing Party, any affiliate thereof, or a Disclosing Party Opportunity; or (B) hiring any such individuals who become aware of employment opportunities other than by a solicitation prohibited by this Section 4 and approach the Receiving Party seeking such employment.

5.       **Permissible Disclosure**.  The Receiving Party may disclose Confidential Information if such disclosure is required by applicable law, rule, or regulation or in response to an order or request from a court, or other governmental agency or regulatory commission to disclose such Confidential Information; provided, however, that before making such disclosure, the Receiving Party shall first give the Disclosing Party prompt and reasonable notice of such request to enable Disclosing Party the opportunity to object to the order or request, and/or to obtain, at its sole expense, a protective order covering the Confidential Information to be disclosed.

2

6.      **Compliance with Securities Laws**.  The Receiving Party hereby acknowledges that it is aware, and that it will advise its Representatives who are informed as to the matters which are the subject of this Agreement, of the restrictions imposed by the United States securities laws on the purchase or sale of securities by any person who has received material, non-public information from the issuer of such securities or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities.

7.      **Severability.**   If any court of competent jurisdiction declares that any term or provision of this Agreement or its application is overly broad as to scope, duration, or area, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision.   If any provision of this Agreement or its application is determined to be invalid or unenforceable, the remaining provisions shall be fully enforceable without regard to the invalid or unenforceable provision.

8.      **Injunctive Relief; Venue.**  The Receiving Party acknowledges and agrees that the unauthorized disclosure of the Confidential Information will cause immediate and irreparable harm that will not be compensable by damages alone if the Receiving Party repudiates or breaches any of the provisions hereof, or threatens or attempts to do so.  As a result of the unique nature of the Confidential Information, in addition to, and not in limitation of, any other rights, remedies, or damages available at law or in equity, the Receiving Party acknowledges that the Disclosing Party shall be entitled to obtain a temporary, preliminary, and/or permanent injunction in a court of competent jurisdiction to prevent or restrain any actual or threatened breach of this Agreement by the Receiving Party, or any person or entity acting in concert therewith.  No bond shall be required to be posted as a condition for the granting of any such relief.  In connection with any application for injunctive relief, the Receiving Party hereby waives the claim or defense that an adequate remedy exists at law.  The Receiving Party also hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of, and the exclusive laying of venue in (and in that regard the Receiving Party agrees not to plead or claim in any court that any such action, suit, or proceeding brought in any such court has been brought in any inconvenient forum) the federal and state courts located in Texas for any action, suit, or proceeding relating to this Agreement.

9.      **Costs**.  In the event that a court of competent jurisdiction determines that a breach of this Agreement has occurred by the Receiving Party, the Receiving Party agrees to pay its share of all reasonable costs and expenses incurred by the Disclosing Party in enforcing the terms of this Agreement, including, without limitation, attorneys' fees and costs.

10.     **No Grant of License**.  No license to the Receiving Party, under any trademark, patent, copyright, or any other intellectual property right, is either granted or implied by this Agreement.

11.     **Accuracy**.  The Disclosing Party makes no representation or warranty, either express or implied, as to the accuracy or completeness of any Confidential Information disclosed hereunder.

12.     **Entire Agreement**.  This Agreement is binding on the Parties hereto and constitutes the entire understanding between the Parties hereto as to the matters set forth herein and merges all prior discussions between them relating thereto.  This Agreement shall be binding upon and for the benefit of the undersigned Parties, and their respective successors and assigns, provided that the limited rights granted under this Agreement to review and use the Confidential Information may not be assigned without the consent of the Disclosing Party.

13.     **No Further Agreement**.  This Agreement does not constitute an agreement with respect to any sort of transaction and no legal obligation of any kind whatsoever shall be deemed to exist on the part of either Party hereto, except as to the matters specifically agreed to herein.  Any Party may terminate discussions or negotiations at any time without any liability whatsoever to the other Party, other than as specifically contemplated in this Agreement.

14.     **Waiver**.  The Disclosing Party may waive any of its rights under this Agreement only by written waiver.  No failure on the part of the Disclosing Party to exercise or delay in exercising any right under this Agreement shall constitute a waiver of such right.

15.     **Notices**.  All notices under this Agreement must be in writing and shall be deemed to have been delivered to and received by a Party, and will otherwise become effective, on the date of actual receipt thereof (which shall be given by personal delivery, express delivery service or certified mail) to the Notice Address of such Party set forth below.

16.     **Governing Law**.  This Agreement shall be governed by the substantive and procedural laws of the State of Texas applicable to contracts formed and to be performed globally.

17.     **Authority**.  The person executing this Agreement on behalf of each of the Parties hereto hereby represents and warrants that he is fully authorized to do so and that such execution will duly bind such Party.


**TYR Energy Logistics, LLC**


By: _____*M Walter*_____

     Michael Walter
     Title:  Managing Partner



**Greg Hunt**


By: _____

     Greg Hunt, Individually

# EXHIBIT B

## MUTUAL CONFIDENTIALITY, NON-DISCLOSURE
## AND NON-CIRCUMVENTION AGREEMENT

This MUTUAL CONFIDENTIALITY, NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT (this "Agreement") is entered into this 24th day of April, 2018 by and between **TYR Energy Coal Logistics, LLC** ("TEH"), a Texas limited liability company and **Geo-Hunt Consulting LLC** ("Geo-Hunt"), a Colorado limited liability company together with its principle Greg Hunt, an individual residing in Colorado with assets and projects in Utah, Colorado and other regions, by and on behalf of Geo-Hunt and himself and his respective subsidiaries and affiliates (hereinafter individually the "Party" and collectively the "Parties" and interchangeably referred to as the "Receiving Party" or the "Providing Party" as applicable).

### RECITALS:

The Parties hereto have an interest to collectively pursue certain business (hereinafter the "Business") related to developing logistics solutions for the export of minerals from North America to international markets (hereinafter the "Permitted Purpose") which requires the disclosure of certain Confidential Information. "Confidential Information" as used in this Agreement shall mean any information provided by a Party to the other Party, including any negotiations or discussions concerning any potential or prospective transaction. All Confidential Information which is provided, learned or acquired by either Party from the other within the scope of this Agreement shall be accepted subject to the terms of this Agreement. Without limiting the generality of the foregoing, Confidential Information includes, but is not limited to, the following types of information (whether or not reduced to writing) designs, concepts, data, diagrams, research, business plans, marketing techniques, product pricing, suppliers, cost saving techniques, strategies and development plans, (including, but not limited to, logistics strategies and solutions developed or proposed by TEH either independently or based on Confidential Information provided by Geo-Hunt, which shall remain the sole and exclusive property of TEH ("TYR Strategies"), customer names, supplies, suppliers, buyer, brokers, end-users, marketing and sales information.

### AGREEMENTS:

In consideration of the Parties hereto disclosing Confidential Information to each other, they agree as follows:

1. Each Party understands and acknowledges that such Confidential Information has been developed or *obtained by the investment of significant time, effort and expense,* and that such Confidential Information provides the Providing Party with a significant competitive advantage in its business. The Receiving Party agrees to hold in confidence and that it shall not copy, alter or disclose or reveal to any person or entity or use any such Confidential Information for any purpose, other than the Permitted Purpose, for a period of one (1) year from the date it receives same. Without restricting the generality of the foregoing, the Receiving Party shall not use such Confidential Information to the detriment of the Providing Party in any way. All such Confidential Information disclosed by the Providing Party pursuant to this Agreement shall remain the property of the Providing Party and shall be returned, to the Providing Party by the Receiving Party, together with copies thereof, promptly upon receipt by the Receiving Party of written request therefore.

2. These restrictions on the use or disclosure of Confidential Information shall not apply to any Confidential Information which:

   • is generally available to the public or has become generally available to the public without breach of this Agreement by the Receiving Party; or
   • the Providing Party agrees in writing is free of such restrictions; or
   • becomes lawfully available to the Receiving Party *without any restriction of confidentiality from a third party free from confidentiality obligations with respect thereto;* or

- was independently developed by the Receiving Party without use of the Confidential Information prior to the date of this Agreement.

3. The Receiving Party further agrees not to circumvent the Providing Party and not contact potential clients, customers, or product or service providers about the Businesses except through the Providing Party by using or taking advantage of the Confidential Information for a period of one (1) year from the date it receives same. Notwithstanding the foregoing, nothing in this Agreement shall be construed to prevent a party from conducting its business, as currently conducted, at the time hereof. The TYR Strategies shall remain the sole and exclusive property of TEH and Geo-Hunt shall not use the Confidential Information contained in the TYR Strategies for any purpose whatsoever other than as expressly set forth herein, and TYR shall not use the Confidential Information contained in the Geo-Hunt Strategies and geologic data.

4. This Agreement shall not be assignable, as of right, by either Party. All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the Parties and their respective heirs, successors and permitted assigns.

5. The Receiving Party agrees that a breach of this Agreement cannot adequately be compensated by money damages; therefore, the Providing Party shall be entitled, in addition to any order right or remedy available to it, to an injunction restraining such breach or threatened breach and to specific performance of any such provisions of this Agreement as it may deem appropriate. In the event that the Receiving Party becomes legally compelled or required to disclose any of the Confidential Information to a third party, it will provide the Providing Party with prompt notice of such requirement to disclose, so that the Providing Party may seek a protective order or other appropriate legal remedy and/or waive compliance with the provisions of this Agreement, all of which options and choices hereunder are to be at the sole discretion of the Providing Party. In any event, the Receiving Party shall furnish only that portion of the Confidential Information which it is legally required to so furnish.

6. Nothing contained in this Agreement shall be construed as creating a joint venture, partnership or employment relationship as between the Parties. Except as specified herein, no Party shall have the right, power or implied authority to create any obligation or duty, express or implied, on behalf of any other Party hereto.

7. This Agreement sets forth the entire understanding and agreement of the Parties with respect to the subject matter hereof. The formation, interpretation and performance of this contract shall be governed by the laws of Texas without regard to conflicts of law principles. Any and all disputes arising out of or in connection with this Agreement, including any questions regarding its existence, validity or termination, shall be brought only in courts located in Houston, Texas. The Parties hereby waive any and all objections to such forum including, but not limited to, the inconvenience of the parties.

8. This Agreement may be modified in writing and signed by the Parties' signatory hereto effective as of the date first written above.

**Geo-Hunt Consulting LLC**                    **TYR ENERGY COAL LOGISTICS, LLC**

By: _____               By: _____
        Greg Hunt, Owner                                  Kip Eardley, President

# EXHIBIT C

## Geo-Hunt Consulting, LLC
### Consulting Agreement

**PARTIES**

This Agreement is made this 1st day of May, 2018 by and between Geo-Hunt Consulting, LLC (Geo-Hunt), a Colorado Limited Liability Company with principle office at 16577 Columbine Lane, Cedaredge, Colorado 81413, and TYR Energy Coal Logistics, LLC, (TYR), a Texas Limited Liability Company with principle office at 645 Bronco Road, Corpus Christi, Texas 78409, hereinafter referred to as "Client"

**PROJECTS**

Client engages Geo-Hunt to provide services in connection with:
1- Acquisition of the Wildcat Load Facility, Carbonville, UT
2- Other Projects as may be agreed upon.

**SCOPE OF SERVICES**

Geo-Hunt agrees to perform services as follows:
1- Facilitate purchase of Wildcat Loadout Facility by:
   a- Make every effort to bring the negotiations to a successful conclusion at the earliest possible time by convincing seller that publicizing an RFP for sale of the property is not necessary.
   b- Utilizing detail knowledge of the loadout and ability to quickly update knowledge of local business dynamics to negotiate a detail purchase agreement prior to face to face negotiations/or closing between TYR and seller.
2- Other services as mutually agreed upon.

Client agrees that all services not expressly included are excluded from Geo-Hunt's Scope of Service.

**COMPENSATION**

Client agrees to compensate Geo-Hunt for such services as follows:
Geo-Hunt will track and bill Client for services at the rate of $120.00/hour actually worked, plus expenses.

This agreement will say in effect until replaced by a longer term arrangement.

Geo-Hunt and Client acknowledge that each has read and agrees to the General Conditions attached to this document which is incorporated herein and made a part of this Agreement and apply to all services performed by Geo-Hunt.

Client

By: _____
         (Signature)

By: _KIP EARDLEY_____
         (Printed Name)

Title: MANAGING MEMBER

Date: 5-1-2018

Tax ID#: _____

Geo-Hunt Consulting, LLC

By: _____
         (Signature)

By: _Greg Hunt_____
         (Printed Name)

Title: Managing Member

Date: 5-1-2018

Tax ID#: 84-1468427

# Geo-Hunt Consulting, LLC
## Consulting Agreement
### GENERAL CONDITIONS

1.     Invoices shall be submitted to Client periodically for services performed.  Payment is due within 30 days of invoice date.  Payments which are more than 30 days past date of invoice shall accrue interest at 1.5% per month.

2.     Upon the failure to pay an invoice timely, Geo-Hunt may, without further notice to Client, suspend all services until such balances are paid in full.  Failure to pay for more than 60 days past invoice-date constitutes a material breach of the Agreement.

3.     All reports and other documentation prepared by Geo-Hunt are for the exclusive use of the Client and only for the Project specified.  Client understands that no other use is authorized and agrees not to distribute Geo-Hunt's reports or recommendations to any other person or entity other than as required by the contract documents without Geo-Hunt's written consent.

4.     Indemnity.  Client agrees to hold harmless, defend and indemnify Geo-Hunt from any and all claims, damages, liabilities, and/or expenses arising from any unauthorized distribution or release of Geo-Hunt's reports, findings, recommendations, etc.

5.     Geo-Hunt's services shall be performed in accordance with the standard of care and skill ordinarily recognized by others in the same profession under similar conditions in the same area and at the same time as the services are performed.  Other than the statements contained herein, Geo-Hunt makes no warranties, representations, guarantees, with respect to the results to be provided under this Agreement.

6.     Client is responsible for providing to Geo-Hunt all information regarding existing conditions to the site.  Such information shall include, but is not limited to, the location and type of any hazardous materials, and the uses expected for the site.  Client shall also provide all new information that becomes available. Client shall notify Geo-Hunt in the event of any change in the proposed uses and/or conditions of the site. Client waives all claims against Geo-Hunt for liability based upon inaccurate information furnished by Client or others acting on behalf of Client.  Client shall hold harmless, defend and indemnify Geo-Hunt from all claims, liabilities, demands and expenses arising in any way from any such erroneous information.

7.     Client shall accurately identify the location of all property lines of the site and the location of all underground installations such as, but not limited to, electrical lines, telephone lines, sewer lines, storage tanks, and utilities within the site boundaries.  Client shall ensure that Geo-Hunt's personnel and equipment have unrestricted access to the site at no additional cost to Geo-Hunt.

8.     Geo-Hunt shall not be responsible or liable for the acts or omissions or any damages resulting from work performed by Client or third parties acting under the control of Client or someone other than Geo-Hunt.

9.     Without Geo-Hunt's written authorization, Client shall not make any modifications to Geo-Hunt's Work.  Client agrees to hold harmless, defend and indemnify Geo-Hunt from any and all claims arising from the breach of this provision.

10.     Client shall be responsible for overall job site safety.  Client shall not be required, however, to supervise Geo-Hunt's employees, subcontractors or subconsultants.

11.     As required, Geo-Hunt shall preserve samples obtained from the Project for 60 days after the preparation of any report that includes the data obtained from the sample.  Client shall promptly pay the costs for removal and lawful disposal of all samples, cuttings and/or hazardous materials removed from the Project, unless otherwise agreed in writing.

12.     Except as may be required by law, Client shall remain responsible for notifying all appropriate city, state, federal agencies, and prospective buyers of the existence and type of all hazardous and/or dangerous materials located on the site.

13.     In the event job site conditions or circumstances are discovered during the course of performance which were not contemplated by or made known to Geo-Hunt at the time of execution

# Geo-Hunt Consulting, LLC
## Consulting Agreement

### GENERAL CONDITIONS Cont.

of this Agreement, or the performance of the work, whichever is sooner, Client and Geo-Hunt shall renegotiate in good faith, new terms and conditions of this Agreement to address the newly-discovered issues. If agreement cannot be reached within 15 days after notice, at Geo-Hunt's sole discretion, Geo-Hunt may terminate the Agreement.

14.      Either party to this Agreement may terminate the same upon 30 days prior written notice sent by certified, first class mail, return receipt requested.  Upon termination, Client shall pay all outstanding charges for work performed and all reasonable charges and costs for Geo-Hunt's demobilization.  Client shall have no obligation to pay for any work performed by Geo-Hunt after the end of the 30 day period.

15.      In the event of termination, all releases, indemnity, limitations, and payment obligations as set forth in this Agreement, shall survive the termination.

16.      Without prior written consent, neither Client nor Geo-Hunt shall assign its interest in this Agreement.

17.      Except for injury, claims, damages, losses, which are caused by the sole negligence or willful misconduct of Geo-Hunt, Client waives any and all claims of the same against Geo-Hunt, and agrees to hold harmless, defend and indemnify Geo-Hunt from any and all such claims, damages, expenses, including, but not limited to, fear of or actual exposure to the release of toxic or hazardous substances, delay of the work, property damage, and/or any other consequential damages of any kind or manner, which arise directly or indirectly as a result of the services provided by Geo-Hunt pursuant to this Agreement.

18.      Disputes.  In the event of a dispute, Geo-Hunt may demand binding arbitration at its sole option.  In the event arbitration is demanded, such shall be conducted through the American Arbitration Association in accordance with its construction industry rules, or other such applicable rules, as the parties may agree.  In any event, each party shall be entitled to perform limited discovery and to provide disclosure statements as provided for in the Arizona Rules of Civil Procedure then effective.  In the event arbitration is not elected, either party is free to pursue a claim through the appropriate judicial forum.

19.      In the event Geo-Hunt's Work is delayed by Client, Client shall compensate Geo-Hunt for such additional costs incurred by Geo-Hunt based upon the delay.  Such additional costs shall include additional labor and other charges to maintain its work force during the delay and/or for reasonable demobilization and remobilization charges.  Such charges shall also include a component for Geo-Hunt's overhead and profit.  In the event litigation is required to enforce any term of this contract, the parties agree that judicial jurisdiction is appropriate in the court of the county in which this Agreement is to be performed.

20.      Integration.  This Agreement is the entire agreement between the parties.  Any and all modifications to this Agreement shall be in writing and signed by authorized representatives of both parties.  In the event any particular term or condition of the contract is not immediately enforced by a party, such shall not be construed as a waiver of that term, or of any other term of this Agreement.

# EXHIBIT D

# Master Brokerage Fee Agreement

This Broker Fee Agreement (the "Agreement") is made and entered into this 4th day of May, 2018 (the "Effective Date"), by and between Geo-Hunt Consulting, LLC, whose principal place of business is 16577 Columbine Lane, Cedaredge, CO 81413 (hereinafter "Geo-Hunt") and TYR Energy Coal Logistics, LLC, a Texas Limited Liability Company with principle office at 645 Bronco Road, Corpus Christi, Texas 78409, (herein after "TYR").

1.     Nature of Services

Geo-Hunt hereby agrees to supply TYR and TYR hereby agrees to engage Geo-Hunt to provide brokerage services in the coal supply market, to locate acceptable coal supply at a currently producing mine and facilitate sale of coal from the producer to TYR or its designee.

2.     Terms of Business

Geo-Hunt shall have no agency authority to bind TYR in any transaction for the purchase or sale of coal, unless authorized in writing by TYR. It is recognized and agreed by the parties the Geo-Hunt does not and cannot act as a principal of TYR, or take title to, the coal being bought and sold and Geo-Hunt does not, without written authority, have the legal capacity of the buyer or seller of the coal to enter into contracts respecting the sale of coal, to guarantee delivery of coal, or assess the creditworthiness of the parties to a given transaction.

Geo-Hunt chooses not to accept fee for services from both producer and TYR, as is common in the industry, but instead has chosen to accept a fee for said brokerage services from TYR only.

The parties agree that TYR and coal producer will be wholly responsible for the settlement of each transaction as between themselves, and TYR will not rely on Geo-Hunt for any settlement of specific transactions. Such transactions will be settled and confirmed by the specific terms of the written confirmation between TYR and the coal producer in accordance with the terms and conditions of the contractual agreement between TYR and said coal producer.

3.     Charges & Payment

Geo-Hunt charges and is hereby entitled to a brokerage fee for its services (the"Fee") as full compensation and consideration for the performance of its work hereunder. The brokerage fee is one dollar ($0.10) per metric ton for each ton of coal sold under this agreement, measured and earned as loaded in truck or rail at mine mouth. TYR shall wire brokerage fees into Geo-

Geo-Hunt LLC & TYR_ Master Brokerage Fee Agreement               Page 1 of 4

Hunt's bank account monthly within one week following its receipt of payment for each month's coal shipment from its customers.

In accordance with best practice, confirmations shall be matched with trades as soon as is possible but no later than four business days after each trade. Geo-Hunt will not be held liable for trade differences that arise as a result of confirmations not being checked promptly upon receipt of such confirmation. Geo-Hunt shall have the right to audit at its expense, the books and records of TYR respecting its purchase and sale of coal in order to confirm fees due, owing and paid pursuant to this Agreement.

4.    Confidentiality

The parties shall keep confidential all information relating to this Agreement (including the Fee), and any other confidential or proprietary information which one party may become aware about the other party, except to the extent that such information has become public knowledge otherwise than in breach of this Agreement or disclosure is required by a court or agency exercising jurisdiction over the subject matter hereto, or by law, rule or regulation, provided that the disclosing party gives prior written notice to the other party of the impending disclosure.

5.    Term

This Agreement shall commence on the Effective Date and shall remain in full force and effect until terminated by either party providing the other party advance notice in writing of its intention to terminate or amend this Agreement of not less than thirty (30) business days. Termination shall not affect the completion of obligations that have already arisen under this Agreement including without limitation the payment of all outstanding Fees by TYR.

6.    Exclusion of Liability and Indemnity

Except to the extent mandated by applicable law, neither party shall be liable by reason of any representation (unless fraudulent) or any implied warranty, condition, or other term, or any duty at common law, or under the express terms of this Agreement, for any loss of profit or any indirect, special or consequential loss, damage, costs, expenses, or other claims (caused by negligence or otherwise of Geo-Hunt or TYR) which arise out of or in connection with this Agreement. The entire liability of Geo-Hunt and/or TYR in connection with this Agreement shall not exceed the amount of Geo-Hunt's fees for the provision of the transaction at issue.

Neither party shall be deemed to be in breach of this Agreement by reason of any delay in performing, or any failure to perform, any obligation in relation to this Agreement, if the delay or failure was due to any cause beyond the reasonable control of Geo-Hunt or TYR.

7.    General

This Agreement constitutes the entire agreement between the parties respecting the subject matter hereof and supersedes any previous agreement or understanding with respect to the subject matter hereof and may not be varied except in writing between the parties. All other terms and conditions express or implied by statue or otherwise, are excluded to the full extent permitted by law. Any notice required or permitted to be given by either party to the other under these conditions shall be in writing addressed to the other party to its principal place of business or such other address as may at the relevant time have been notified pursuant to this provision to the other party giving the notice. If any provision of these conditions is held by any competent authority to be invalid or unenforceable in whole or in part, the validity of the other provisions of these conditions and the remainder of the provision in question shall not be affected. In the event of a breach of this Agreement, the prevailing party shall be entitled to recover its costs of collection, including reasonable attorney's fees. Each party signing this Agreement represents and warrants that they are duly authorized to execute this Agreement on behalf of the entity they represent.

8.    Assignment

Neither party may assign or transfer any of its rights under this Agreement without the prior written consent of the other party, which consent may not to be unreasonably withheld.

9.    Governing Law

The laws of the State of Texas shall govern any dispute arising under this Agreement. In the event of a dispute between Geo-Hunt and TYR and/or their designees, any disputes between the parties shall be resolved pursuant to good faith efforts by such disputing parties. The parties shall first attempt to resolve the dispute by means of negations between, the parties, should that be unsuccessful the parties may enter binding arbitration. In the event of arbitration, such shall be conducted through the American Arbitration Association in accordance with its construction industry rules, or other such applicable rules, as the parties may agree. In any event, each party shall be entitled to perform limited discovery and to provide disclosure statements as provided for in the Texas Rules of Civil Procedure then effective. In the event arbitration is not pursued, either party is free to pursue a claim through a court of competent jurisdiction.

10.    Specific Producers

As specific producers are identified, details of the producers contact and mine/offtake locations will be added to this agreement as attachments A through (_) as a single attachment for each producer referencing this agreement and will become part of this agreement by this reference.

Intending to be legally bound hereby, the TYR and Geo-Hunt have executed this Agreement as of the Effective Date.

TYR ENERGY COAL LOGISTICS, LLC

Name:    Kip Eardley
Title:     Managing Member

Date: 5/4/2018

Geo-Hunt Consulting LLC

Name:    Gregory L Hunt
Title:     Managing Member

Date: 4 May 2018